IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT A. JOINER,                )
                                 )
            Plaintiff,           )
                                 )
      v.                         )      CASE NO. 2:19-CV-374-WKW
                                 )              [WO]
MELISSA HINES, *et al.*,          )
                                 )
            Defendants.          )

## MEMORANDUM OPINION AND ORDER

In September 2006, Plaintiff Robert Joiner ("Joiner"), a black man, began

working for the Alabama Onsite Wastewater Board ("AOWB") as a compliance

officer.  Joiner held this position for nearly thirteen years until his employment with

the AOWB was terminated in September 2019.  Following his termination, Joiner

sued the executive director of the AOWB, Melissa Hines ("Hines"), and every

member of the AOWB board.  The individual AOWB board members are Randall

Anderson, Brent Bradshaw,[1] Michael Dansby, Sharon Kimbrough, David Mastin,

Michelle Stephens, David Vogelgesang, Kevin White, and Leigh Willis (collectively

"Board Members").  Joiner has sued each Defendant in his or her individual capacity.

He brings the following claims, as enforced by 42 U.S.C. § 1983, against all

Defendants:  (1) hostile work environment in violation of the Equal Protection

---

[1] Mr. Bradshaw has died. Joiner has not substituted his estate. (Doc. # 58, at 1.)

Clause of the Fourteenth Amendment (Count 1); (2) disparate treatment based on race in violation of the Equal Protection Clause (Count 2); and (3) retaliation in violation of the First Amendment (Count 3). (*See* Doc. # 44.)

Before the court is Defendants' motion for summary judgment (Doc. # 56), which has been fully briefed (Docs. # 58, 66, 71). For the reasons discussed below, the motion is due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over Joiner's claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction). Personal jurisdiction and venue are not contested.

## II. STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from the evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material

fact.  *Id*.  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND

### A.  <u>The AOWB</u>

The AOWB is a state agency "created to examine, license, and regulate persons engaged in the manufacture, installation, or servicing of onsite sewage systems in Alabama."  Ala. Code § 34-21A-1.  The AOWB functions "to establish the qualifications levels for those engaged in the manufacture, installation, servicing, or cleaning of onsite sewage systems and equipment in Alabama and promote the

proper manufacture, installation, and servicing" of the same. *Id.* Nine individuals serve on the AOWB. § 34-21A-3(a). "Of the nine members of the board, three members [are] appointed by the Governor, three members [are] appointed by the Lieutenant Governor, and three members [are] appointed by the Speaker of the House of Representatives of the Alabama Legislature." *Id.* Moreover, the AOWB board members "select and employ an executive director who" serves "at the pleasure of the board and who" is "responsible for the administration of board policies." § 34-21A-5(b). The executive director is "responsible for employing and supervising other support personnel as directed by the board." *Id.* Pursuant to the AOWB's Employee Policies and Procedures Handbook, the executive director has the sole authority to suspend and dismiss agency employees. (*See* Doc. # 57-10, at 51, 53.)

Additionally, the handbook provides employees "with a written summary of some of the important policies, rules, and standards of conduct which govern [their] employment with" the AOWB. (Doc. # 57-10, at 6.) Several of the handbook's provisions are relevant here. First, the handbook forbids harassment based on, among other things, race and outlines the procedure for reporting such conduct:

> If you believe you are being harassed by a coworker, supervisor, manager, or any other individual in the workplace or in the field (whether or not employed by the Board), . . . you should report the conduct promptly so that it can be stopped . . . . Generally, employees should report such matters to the Executive Director. However, in cases where an employee feels threatened or uncomfortable reporting such

incidents to the Executive Director or where the Executive Director is the offending party, the employee should make a report to a higher level supervisor . . . , such as Chairman of the Board . . . . *All* allegations must be documented by the party receiving the report, with a copy forwarded to the Executive Director.

If the Board receives an allegation of harassment, or has reason to believe such harassment is occurring, including situations involving an outside party, it will take steps necessary to ensure that the matter is promptly investigated and addressed.

(Doc. # 57-10, at 20 (emphasis in original).)

Second, the handbook establishes the standards of conduct that AOWB employees must follow. For instance, employees are prohibited from engaging in "[m]alicious or excessive griping; loud, disruptive talking that affects the activities of other employees; vulgar, abusive, or threatening language; and emotional outbursts at another individual or the Board . . . ." (Doc. # 57-10, at 17.) The handbook also provides that "[f]ailure to comply with the Executive Directors [sic] instructions, arguing with the Executive Director, and resisting authority . . . are unacceptable and will subject the employee to disciplinary action." (Doc. # 57-10, at 17.) Finally, the handbook states that when an employee engages in a serious violation, like insubordination, he or she may be subject to suspension or dismissal for the first offense. (Doc. # 57-10, at 17.)

In addition to the standards of conduct outlined in the AOWB handbook, employees holding merit system positions in Alabama, like Joiner held, must also comply with the general work rules found in the Alabama Administrative Code r.

670-X-19-.01. Under this code provision, "violations that normally result in disciplinary actions of increasing severity" include absenteeism, inattention to job, failure to perform the job properly, and violation of specific department rules. Ala. Admin. Code r. 670-X-19-.01(1)(a)(1), (3), (4), (8). "More serious violations that may result in suspension or discharge on the first offense" include insubordination, disruptive conduct, and conduct unbecoming of a state employee. Ala. Admin. Code r. 670-X-19-.01(1)(b)(2), (12), (13). A merit system employee may also be disciplined "for other sufficient reasons" if his or her conduct does not fall into one of the enumerated categories listed in the code section. Ala. Admin. Code r. 670-X-19-.01(2).

Moreover, the AOWB adheres to a progressive discipline policy. (Hines Dec., at 6–7; *see also* Doc. # 57-10, at 55 (explaining that the AOWB "follows the progressive discipline system used by all state agencies").) Under the policy, supervisors start with counseling and informal warnings, move to written reprimands, then to suspension, and finally termination. The State provides appeal procedures for merit system employees who are suspended or terminated.

## B. Joiner's Employment History with the AOWB

On September 22, 2006, the AOWB hired Joiner into the position of field compliance officer. (Doc. # 57-16, at 2.) As a field compliance officer, Joiner investigated complaints made about onsite sewage equipment and treatment

6

systems.  (Hines Dep., at 7; Joiner Dec., at 2.)  Joiner also performed goodwill visits to licensees[2] and assisted with annual licensing renewals.  (Hines Dep., at 7; Joiner Dec., at 2.)  While the AOWB is headquartered in Montgomery, Alabama, Joiner's base of operations was at his home in Roanoke, Alabama, for most of his employment.  (Joiner Dep., at 75.)  During the time that Joiner was based in Roanoke, he came into the AOWB's Montgomery office about once a week.  (Joiner Dep., at 35.)

Joiner's first supervisor at the AOWB was executive director Gary Stringfellow.  (Joiner Dep., at 48.)  Mr. Stringfellow supervised Joiner for several years until he stepped down from his position as executive director.  (Joiner Dep., at 48.)  Mike Talley ("Talley") filled the executive director vacancy following Mr. Stringfellow's departure.  (Joiner Dep., at 48.)  Prior to assuming the executive director role, Talley worked as a licensed compliance supervisor.  (Talley Dep., at 6–7.)[3]  In addition to his responsibilities as executive director, Talley continued to perform field compliance officer duties alongside Joiner.  (Talley Dep., at 6–7.)  During Talley's tenure as executive director, only he and Joiner performed field

---

[2]  A licensee "is a person who installs, pumps, or manufactures septic tanks in the State of Alabama or services portable restrooms."  (Hines Dep., at 7.)

[3]  As a licensed compliance supervisor, Talley's job responsibilities included "conducting "investigations" and overseeing "compliance officers within the agency."  (Doc. # 67-1, at 2.)

compliance officer duties. (Joiner Dep., at 48–49.) The AOWB did not employ any other field compliance officers.

Throughout Joiner's employment with the AOWB, he received many performance appraisals. Joiner received one score of "meets standards,"[4] eleven scores of "exceeds standards," and one score of "consistently exceeds standards." (*See* Doc. # 57-17, at 2–26 (performance appraisals).) Moreover, Talley testified that under his supervision, Joiner did an excellent job as a field compliance officer. (Talley Dep., at 10.) On October 31, 2016, Talley retired from his position as executive director. The AOWB appointed Melissa Hines ("Hines"), a white woman, to take his place. Hines's appointment took effect on November 1, 2016. (Doc. # 57-13, at 2.) This is when Joiner's troubles began.

### 1. Joiner's disciplinary history at the AOWB

On June 19, 2017, Hines issued Joiner a written reprimand informing him that he was unprofessional and argumentative toward Leigh Willis ("Willis"), a member of the AOWB board and an employee with the Alabama Department of Public Health ("ADPH"), on two separate occasions. (Doc. # 57-19, at 2.) The first occasion involved a conversation between Joiner and Willis about reopening a restaurant that had been closed due to raw sewage surfacing from the ground. The

---

[4] Joiner's lone score of "meets standards" came on March 27, 2007, during his probationary period with the AOWB. (Doc. # 57-17, at 2.)

second occasion involved a conversation between Joiner and Willis regarding a complaint about a portable toilet. During both discussions, Joiner disagreed with Willis's approach to handling the respective situations. In the reprimand, Hines reminded Joiner that "[w]e need to remember that we are working on building bridges and trying to maintain a united front with the [ADPH] and confrontations or 'arguing' with ADPH staff on what they do is not the way to do this and cannot be tolerated." (Doc. # 57-19, at 2.) Joiner refused to sign the written reprimand because he believed it contained inaccurate information. (Joiner Decl., at 12.) Instead, he provided Hines with a response letter explaining his version of the events. (Doc. # 67-19, at 25–25.)

On August 6, 2018, Hines gave Joiner a written warning for his failure to comply with Policy # 2018-060518 ("Policy 2018"). (Doc. # 57-21.) Hines developed Policy 2018 to promote accountability among AOWB employees. As relevant here, Policy 2018 required field compliance officers to report to the Montgomery office by 10:00 a.m. on Monday mornings; contact the Montgomery office three times per day (8:15 a.m., 1:00 p.m., and 3:15 p.m.); "submit written reports regarding complaints from the previous week" to Hines; and provide Hines with a copy of their weekly schedules so that she could approve it. (Doc. # 57-22, at 2.) The warning noted that Joiner did not submit any weekly schedules to Hines

for her approval.[5]  Hines informed Joiner that his failure to follow procedures was considered insubordination.  Joiner signed the warning and included a handwritten note at the bottom indicating that he turned in his weekly schedules to Hillary Houlton—the AOWB secretary at the time.  (Doc. # 57-21.)

On February 12, 2019, Hines sent Joiner a notice of suspension hearing letter. (Doc. # 57-23.)  The letter detailed several instances that Hines believed warranted Joiner's suspension. First, Hines held a staff meeting on July 30, 2018, to discuss professional conduct and confidentiality at the AOWB.  During the discussion about confidentiality, Joiner said aloud that he was a grown man and that he could not be told to whom he could speak.  Following the staff meeting, Hines circulated a memo regarding professional conduct, but Joiner refused to sign it.   Next, the letter recounted a January 24, 2019 board meeting, during which Joiner again exhibited unprofessional conduct.   Specifically, the letter recounted that Joiner talked over board members, argued needlessly, and made rude gestures while others were speaking.   Finally, the letter provided that Joiner did not comply with Policy 2018 when he failed to schedule compliance visits and to submit weekly activity sheets. (Doc. # 57-23, at 3.)  Based on the charges, Hines informed Joiner that he failed to

---

[5]  The warning also provided that Joiner did not comply with Policy 2018 on August 3, 2018, when he "failed to call in at the scheduled time of 1:00 p.m. or 3:15 p.m." (Doc. # 57-21, at 2.)  However, that portion of the warning is crossed out with a handwritten annotation from Hines indicating that she spoke to Joiner on the phone on the day in question.  Both Hines and Joiner initialed the annotation.

perform his job properly and that he engaged in insubordination, thus violating various provisions of Ala. Admin. Code r. 670-X-19-.01.

Joiner appealed Hines's suspension decision to the Alabama State Personnel Board ("SPB"). On February 26, 2019, an Administrative Law Judge ("ALJ") held a hearing to determine whether there was sufficient evidence to support Hines's decision to suspend Joiner. (*See* Doc. # 57-44 (transcript of suspension hearing).) On April 17, 2019, the ALJ issued an opinion finding that Hines acted in accordance with Ala. Admin. Code r. 670-X-19-.01 and recommended that the SPB affirm her decision to suspend Joiner. (*See* Doc. # 57-43 (ALJ's decision recommending that Joiner's suspension be affirmed).) On May 7, 2019, Hines suspended Joiner without pay for fourteen days. (Doc. # 57-24.)

Things came to a head on September 16, 2019, when Hines gave Joiner a notice of pre-dismissal letter. (Doc. # 57-29.) The pre-dismissal letter listed the following infractions as grounds for terminating Joiner's employment: (1) at a July 30, 2019 board meeting, Joiner was unprofessional and disruptive when he ate loudly and took phone calls during the meeting; (2) Joiner failed to implement Policy # 2019-008 ("Policy 2019"); (3) Joiner disclosed confidential information about a licensee to another licensee that resulted in a formal complaint against Joiner; (4) on September 10, 2019, Joiner failed to communicate his whereabouts to Hines or AOWB staff; and (5) Joiner "failed to follow protocol by going to the Shelby County

Health Department regarding a complaint without" Hines's approval. (Doc. # 57-29, at 2–3.) Based on these infractions, the letter indicated that Joiner failed to perform his job properly, displayed poor work performance, breached confidentiality, and engaged in insubordination, in violation of Ala. Admin. Code r. 670-X-19-.01. A pre-dismissal conference was held, during which Joiner had the opportunity to address the allegations in the letter and tell his side of the story. Joiner, Hines, and Board Members David Mastin and Brent Bradshaw attended the conference. Joiner testifies that Mastin and Bradshaw wore pistols to the conference. (Joiner Decl., at 16.)[6] Shortly after the conference, on September 20, 2019, Hines terminated Joiner's employment with the AOWB. (Doc. # 57-30.)

Joiner also appealed Hines's decision to terminate his employment to the SPB. On November 8, 2019, an ALJ held a hearing to determine whether there was sufficient evidence to sustain Joiner's dismissal based upon his violations of SPB rules and AOWB policies and procedures. (*See* Doc. # 57-46 (transcript of termination hearing).) On January 3, 2020, the ALJ issued an opinion finding that the evidence presented warranted Joiner's dismissal and recommended that the SPB uphold Hines's decision. (*See* Doc. # 57-47 (ALJ's recommendation on Joiner's termination).) The ALJ noted that "Joiner was afforded progressive discipline for

---

[6] Mastin testifies that he previously worked in law enforcement and was required to carry a pistol every day. Although he no longer works in that profession, he testifies that he continues to carry a pistol every day for his own safety. (Mastin Dec., at 4.)

prior violations of SPB General Work Rules when he was suspended for a 14-day period in May 2019 and issued a written warning in June 2019." (Doc. # 57-47, at 16.) The ALJ concluded that because Joiner failed to improve his conduct, the "AOWB was left with no recourse other than dismissal." (Doc. # 57-47, at 17.)

In December 2019, roughly three months after Joiner's dismissal, Hines hired Caleb Kilpatrick, a white man, to replace him. (Hines Dep., at 15, 18.)

### 2. Discriminatory and retaliatory events that Joiner identifies

Joiner identifies several events that he believes support his claims for discrimination and First Amendment retaliation. These events are outlined below.

### a. Failure to promote and pay discrepancy

Talley testifies that before he retired, he discussed with Hines and the AOWB the possibility of promoting Joiner to chief compliance officer. (Talley Dep., at 10–12.) According to Talley, he suggested this course of action in lieu of hiring additional compliance officers because it would help reduce the AOWB's costs until the agency's finances improved. (Talley Dep., at 11.) The board instructed Hines to "bring back a plan of action for staff and salaries at the" next AOWB meeting. (Doc. # 67-9, at 4.) Hines did not heed Talley's suggestion. Instead, she submitted a letter to the SPB's director of finance requesting permission to hire two additional field compliance officers, which was granted on November 28, 2016. (Doc. # 67-10.) Ultimately, on January 30, 2017, Hines hired Jerry Todd ("Todd"), a white

man, as a field compliance officer.  (Doc. # 57-31.)  To date, Hines has not hired anybody into the position of chief compliance officer.  (Hines Dec., at 5.)  Joiner also draws attention to the fact that Hines paid Todd at a higher rate than him and that she did not allow him to receive comp time.  (Doc. # 66, at 68.)

### b. Office relocation, office keys, and work clothes

Joiner testifies that prior to Todd's arrival, he enjoyed a private office at the AOWB's headquarters in Montgomery.  (Joiner Dep., at 35.)  At some point in 2017, however, Hines moved Joiner out of the private office and into a shared office space.  (Joiner Dep., at 28, 35; Hines Dep., at 25.)  Hines then moved Todd into the private office.  (Joiner Dep., at 35.)  According to Joiner, when he asked Hines why she moved Todd into the private office, she replied, "He is here every day and wants the office for his privacy."  (Joiner Dec., at 4.)  Todd's base of operations was in Montgomery.  (Joiner Dep., at 35.)

Joiner also testifies that other white AOWB employees, including Todd, had keys to the front door of the AOWB's Montgomery office.  (Joiner Dec., at 5; *see also* Hines Dep., at 26 (explaining that Todd had a key to the Montgomery office).)  However, when Joiner asked Hines for a key, she denied his request.  (Joiner Dec., at 5.)  Hines testifies that she "only had three office keys" and "provided those keys to individuals based on need and the employee's schedule."  (Hines Dec., at 8.)  According to Hines, "she really didn't see the need" to give Joiner a key since he

was based in Roanoke and "only came into the office on Mondays" around 10:00 a.m.  (Hines Dep., at 26.)

Additionally, Joiner asked Hines for official AOWB shirts with breast pockets.  The AOWB already provided Joiner with official shirts, but Joiner wanted shirts with pockets so that he could have a place to store his pens and his glasses.  Hines informed Joiner that the AOWB did not have sufficient funds to accommodate his request.  However, when Todd made a similar request, Hines obliged.  Joiner eventually received Todd's shirts after Todd was fired from the AOWB.  (Joiner Dep., at 47.)

### c.  Hines's change in Joiner's base of operations

On January 8, 2018, Hines sent Joiner a memo informing him that she was changing his base of operations from Roanoke to Montgomery.  The memo provided that "due to accountability issues with your current employment base, beginning January 16, 2018, you will be based at the administrative office located at 60 Commerce Street, Suite 1500."  (Doc. # 57-18, at 2.)  This change required Joiner to come into the Montgomery office from 8:00 a.m. to 4:30 p.m., Monday through Friday.  According to Joiner, the change also resulted in the elimination of his lunch per diem and comp time.  (Joiner Dep., at 75.)  Joiner testifies that when he discussed the change in his base of operations with Hines, she informed him that "she'd get more work done while [he] was in [the Montgomery office]" and that Todd had

complained about Joiner working from home. (Joiner Dep., at 74.) However, several months later, Hines changed Joiner's base of operations back to his home in Roanoke. (Joiner Dep., at 36–37; Hines Dep., at 57.)

### d. Training

Before joining the AOWB, Joiner obtained his basic and advanced level I license to install septic tanks. (Joiner Dep., at 10.) During his employment with the AOWB, Joiner asked Hines for permission to attend training, at the agency's expense, to obtain his advanced level II license. (Joiner Dep., at 45.) Hines denied Joiner's request. (Joiner Dep., at 45.) Joiner testifies that such a denial was racially motivated because Hines allowed other white field compliance officers to attend basic level training. (Joiner Dep., at 45.)

Hines testifies that while "there is no required training for compliance officers," she often sent "AOWB employees to basic level courses so that they may gain an understanding of what is happening in the field and what they are investigating." (Hines Dec., at 9.) According to Hines, she has "never sent any AOWB employee to advance level training." (Hines Dec., at 9; *see also* Joiner Dep., at 46 (testifying that to his knowledge, the AOWB has not sent any other employee to advance level training).)

### e. Computer access to consumer complaint files and disappearance of tape recordings

Both Joiner and Todd had access to consumer complaint files on their computers, which they would access in the field to help them perform their job as compliance officers. (Joiner Decl., at 5.)  Joiner testifies that at some point, he had an issue with his computer and brought it to a technician to service. (Joiner Dep., at 89.)  After the technician returned his computer, Joiner no longer had access to consumer complaint files on the device.  When Joiner discussed the issue with Hines, she told him that he did not need access to the files on his computer because he could call the office to obtain the relevant information.  (Joiner Dep., at 89.)  Todd continued to have access to consumer complaint files on his computer while he was in the field.  (Joiner Decl., at 5.)

After Joiner received a written reprimand on June 19, 2017, he began openly recording conversations that he had with Hines.  (Joiner Dep., at 95.)  According to Joiner, he started recording these conversations because he felt like he was being treated differently based on his race.  (Joiner Decl., at 14.)  Joiner stored the recordings in his AOWB vehicle.  At some point in 2018, however, the recordings disappeared from Joiner's vehicle.  Joiner testifies that he and Hines were the only individuals with keys to his car.  (Joiner Dep., at 94.)[7]

---

[7]  Based solely on this evidence, Joiner argues that there is a genuine dispute of material fact concerning whether Hines removed the tape recordings from his vehicle.  (*See* Doc. # 66, at

### f. Vehicle tracking

In 2018, Hines received reports that Joiner used his AOWB vehicle to conduct personal business. (Hines Dec., at 10.) Hines then had a conversation with Randy Anderson ("Anderson"), chairman of the AOWB, about ways to increase employee accountability and safety. (Hines Decl., at 10.) Anderson suggested that Hines "install tracking devices on all vehicles that were part of the AOWB fleet." (Anderson Dep., at 25.) Following this conversation, Hines placed GPS tracking devices on all AOWB owned vehicles. (*See* Doc. # 57-22 (explaining that the AOWB "will begin using Verizon Connect GPS for office vehicles no later than July 1, 2018").) This included her vehicle and Joiner's vehicle. (Hines Dep., at 19.) The only other field compliance officer working at the time, a white man named Richard Grah ("Grah"), did not have a tracking device placed on his vehicle. (Hines Dep., at 19.) According to Hines, she did not have the authority to install a tracker on Grah's automobile because the AOWB did not own it, but rather rented it from the state motor pool. (Hines Dep., at 20; *see also* Anderson Dep., at 25 (explaining that tracking devices could not be placed on state motor pool vehicles).)

---

59.) His argument is unavailing because "[i]nferences based on speculation and a 'mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment.'" *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)).

### g. Racial comments

Joiner identifies three instances where Hines either failed to address inappropriate racial language used by others or used such language herself. First, Joiner testifies that he called a licensee to inform him that he was coming to his property to perform a compliance visit. The licensee told Joiner that "[i]f you're not black, you can stop by." (Joiner Dep., at 40.) When Joiner reported the incident to Hines, she simply laughed. (Joiner Dep., at 40.) Second, Joiner testifies that Hines failed to intervene when she heard Todd make troublesome comments to Mary-Ann Owen, a black AOWB employee. (Joiner Dep., at 49.) According to Joiner, Todd would reference Ms. Owen by saying "look at the girl with the big old butt." (Joiner Dep., at 49.) Finally, Joiner testifies that Hines asked him if it was true that "once you go black, will you ever go back?" (Joiner Dep., at 41.) After asking the question, Hines rubbed Joiner on his head. (Joiner Dep., at 41.)

### h. Discriminatory treatment of licensees

Joiner testifies that the AWOB treated Clarence Crook, a black licensee, differently than Josh Pesnell, a white licensee. (Joiner Dep., at 29.) Specifically, the AOWB revoked Mr. Pesnell's license for two years after it discovered that his employees were dumping sewage in an unpermitted area that ran into nearby bodies of water. (Joiner Dec., at 10.) By contrast, the AOWB revoked Mr. Crook's license indefinitely after an investigation revealed that he was personally dumping sewage

onto his own land.  (Joiner Decl., at 10.)  Joiner submits that the AOWB punished Mr. Crook more severely than Mr. Pesnell even though his infraction did not involve the possibility of contaminating water with sewage.

### 3. Joiner's complaint to Hines and various Board Members

Joiner testifies that he complained to Hines about her decision to install a GPS tracker on his AOWB vehicle and that he thought her decision was racially motivated.  (Joiner Decl., at 7.)  He also complained to Hines about the way the agency was treating black licensees.  (Joiner Decl., at 7.)  Further, Joiner informed various Board Members that he felt like Hines was discriminating against him because of his race when she did not promote him to chief compliance officer, moved him out of his office, did not give him a key to the AOWB's headquarters, placed a tracking device on his vehicle, did not allow him to access consumer complaint files on his computer, and gave Todd new work shirts.  (Joiner Decl., at 8–9.)  According to Joiner, his complaints went largely unheard.

### 4. Joiner's proposed comparators

#### a.  Jerry Todd

As mentioned above, on January 30, 2017, Hines hired Todd as a field compliance officer.  (Doc. # 57-31.)  Hines started Todd at $1,942.30 (semi-monthly) because of the salary he received from his previous employer.  (Doc. # 57-31.)  By contrast, Joiner's pay in 2019 was $1,690.91 (semi-monthly).  (Doc. # 67-

20, at 3.) Like Joiner, Todd incurred several disciplinary actions during his time at the AOWB. On April 27, 2017, Hines issued Todd a written reprimand for his unprofessional conduct at an AOWB quarterly meeting. (*See* Doc. # 57-35.) During that meeting, Todd became confrontational with AOWB member Derrick Hutchins, swearing and gesturing at him in a threatening manner. (*See* Hutchins Dep., at 12 (describing the events of the April 25, 2017 board meeting).) While this was Todd's first formal discipline, Hines decided to issue a written reprimand due to the severity of his conduct, thus skipping a step in the AOWB's progressive discipline policy. (Hines Dec., at 7.) On January 8, 2018, Hines terminated Todd's employment with the AOWB for continued insubordination. (*See* Doc. # 57-36 (Todd's notice of dismissal letter).) The notice of dismissal letter highlighted an instance on January 5, 2018, when Todd, in the presence of other AOWB staff, refused to perform a task that Hines assigned him, telling her in profane terms that it was not his job. (Doc. # 57-36.) The letter also noted that Todd left the office without prior approval following the incident. On January 12, 2018, the SPB approved Todd's dismissal. (Doc. # 57-37.)

### b. Richard Grah

On July 16, 2018, Hines hired Grah to replace Todd as a field compliance officer. (Hines Dep., at 17.) Because Grah earned a higher wage with his previous employer, Hines started Grah's salary at $1,637.10 (semi-monthly). (Docs. # 57-38;

21

57-39.) Grah's stint at the AOWB did not last long. On August 6, 2018, Hines issued Grah a written reprimand for failing to contact the Montgomery office at the specified times listed in Policy 2018. (Hines Dep., at 18.) Then, on October 22, 2018, Hines terminated Grah's employment with the AOWB. (*See* Doc. # 57-40 (informing Grah that "[f]or the good of state service, your services are no longer needed . . . ").) Hines testifies that she dismissed Grah because he failed to follow procedures and that he did not possess the computer skills necessary to succeed as a compliance officer. (Hines Dep., at 20.)

### c. Joel Barnes

On August 13, 2019, Hines replaced Grah with Joel Barnes ("Barnes"), also a white man. (Doc. # 57-41.) According to Hines, Barnes is still employed as a field compliance officer with the AOWB. (Hines Dec., at 7.) Joiner testifies that Hines permitted Barnes to receive comp time but that she did not afford him the same benefit. (Joiner Dep., at 43; *see also* Hines Dep., at 64 (testifying that she allowed Barnes to receive comp time, but that Joiner never requested the same).)

## IV. DISCUSSION

### A. <u>Collateral Estoppel</u>

As it relates to Joiner's § 1983 claims in Counts 2 and 3, Defendants argue that he is collaterally estopped from relitigating whether race was a factor in his dismissal because that issue has already been decided in prior administrative

hearings before the SPB. Specifically, Defendants contend that the ALJ determined "that race was not a factor" in Joiner's termination and that his "conduct warranted dismissal." (Doc. # 58, at 25.) Joiner, of course, disagrees, asserting that the "issues before the [SPB] were very limited and did not involve evidence" bearing on his discrimination and retaliation claims. (Doc. # 66, at 40.) Joiner is correct.

When a state agency, like the SPB, "'acts in a judicial capacity'" to "'resolve[] disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' . . . federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliot*, 478 U.S. 788, 799 (1986) (quoting *Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)). This preclusive effect (*i.e.*, collateral estoppel) "applies even where the agency's fact-finding is not reviewed by a state court." *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1329 (11th Cir. 2003) (citations omitted). Here, it is undisputed that the SPB acted in a judicial capacity when it determined that Joiner's conduct warranted the termination of his employment from AOWB. Thus, the inquiry focuses on whether Joiner's § 1983 claims in Counts 2 and 3 are barred under Alabama's law of collateral estoppel. *See id*. at 1329 n.8 ("In § 1983 cases, federal courts considering whether to give preclusive effect to [state administrative] judgments must apply that state's law of collateral estoppel.") (alteration added).

Under Alabama law, collateral estoppel applies to issues raised in state administrative proceedings provided that five elements are met: "(1) there is identity of the parties or their privities; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision." *Wal-Mart Stores, Inc. v. Smitherman*, 743 So. 2d 442, 445 (Ala. 1999), *overruled on other grounds by Ex parte Rogers*, 68 So. 3d 773 (Ala. 2010).

Here, an examination of the narrow issues presented to the ALJs during Joiner's suspension and termination hearings reveals the flaws in Defendants' collateral estoppel argument. *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Trans.*, 768 F.2d 1558, 1581 n.16 (11th Cir. 1985) (explaining "that when the scope of the administrative hearing is much narrower than a subsequent lawsuit, collateral estoppel will not be applied"). For instance, the only issues presented during Joiner's suspension hearing were: (1) "[w]hether there was evidence to support the Executive Director's decision to suspend Joiner for Insubordination based on conduct he exhibited at the January 24, 2019 Board meeting"; and (2) "[w]hether there was evidence to support the Executive Director's decision to suspend Joiner for failure to follow [Policy 2018] when Joiner failed to properly

schedule compliance visits and failure to properly turn in activity sheets." (Doc. # 57-43, at 5.) Additionally, the sole issue presented during Joiner's termination hearing was whether the AOWB had "sufficient evidence to sustain Joiner's dismissal based upon violations of SPB Rules and AOWB's policies and procedures." (Doc. # 57-47, at 14.)

The legal issues in this litigation are not so limited. Consider Joiner's disparate treatment claim. To prevail on this claim, Joiner must prove that Defendants' asserted reasons for suspending and terminating him were a cover up for discrimination. The fact that the AOWB persuaded the ALJs that Joiner violated certain agency and SPB rules does not directly answer this question. Likewise, Joiner's First Amendment retaliation claim deals with issues (*i.e.*, was Joiner's speech a matter of public concern?) that are wholly distinct from the issues presented during the administrative hearings.

Nor were the legal issues in this litigation actually litigated during Joiner's suspension and termination hearings. The words "discrimination" and "retaliation" do not appear once in either the transcript from Joiner's suspension hearing or the ALJ's recommendation flowing from that proceeding. True, Joiner did briefly testify during his termination hearing that he felt his dismissal from the AOWB was racially motivated and outlined several instances underscoring his belief. (*See* Doc.

# 57-46, at 56–57.) Unsurprisingly though, Joiner's brief testimony amounted to an equally cursory analysis in the ALJ's recommendation upholding his termination:

> There was no substantive evidence presented to the undersigned about racial discrimination and retaliation against Joiner. Joiner testified that he was not given a key to AOWB offices, that he had a tracking device, on his state vehicle, his office was given to another compliance officer and he was given another office in AOWB's Montgomery office. Even if these actions did occur, they do not rise to the level of being adverse employment actions.
>
> Joiner believes he has suffered racial discrimination and retaliation and has a pending federal complaint. The evidence presented in this employment discharge appeal does not support Joiner's claims.

(Doc. # 57-47, at 17.) This limited analysis—more of a passing thought—in the ALJ's recommendation does not support the position that the issues of whether Defendants treated Joiner differently on the basis of his race or retaliated against him for exercising his First Amendment rights were actually litigated during the termination hearing.

Because the legal issues in this case are different from those presented during the administrative hearings, and because the issues in this case were not actually litigated during the administrative hearings, the doctrine of collateral estoppel does not prevent Joiner from relitigating whether Defendants treated him differently based on his race or retaliated against him in violation of the First Amendment.

Nevertheless, Joiner is collaterally estopped from relitigating whether he committed the misconduct underlying his suspension and termination from the

AOWB.  *See Rawlinson v. Whitney Nat'l Bank*, 416 F. Supp. 2d 1263, 1274 (M.D. Ala. 2005) (finding that while the results of a previous proceeding did not collaterally estop the plaintiff from relitigating her claims of race discrimination, she was "collaterally estopped from relitigating whether she committed" the misconduct underlying her termination).  However, this is not *necessarily* fatal to his claims in this case.

## B.  Hostile Work Environment

A plaintiff bringing a hostile work environment claim under the Equal Protection Clause, as enforced by § 1983, must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [his] employment."  *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004) (alteration added).[8]  To meet this standard, a plaintiff must prove:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

---

[8]  In the Eleventh Circuit, "discrimination claims, including hostile work environment claims, brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, are subject to the same standards of proof and the same analytical framework."  *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (alteration added).  Additionally, "courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999); *see also Miller*, 277 F.3d at 1276 (explaining that the Eleventh Circuit has adopted the "totality of the circumstances approach" in hostile work environment cases).

Defendants assert that Joiner's hostile work environment claim fails for two reasons.  First, Joiner impermissibly relies on evidence of discrete acts of discrimination, which "cannot support a claim for hostile work environment." (Doc. # 71, at 22.)  Second, Defendants contend that Joiner fails to present evidence— necessary to survive summary judgment—that the harassing conduct he complains of was sufficiently severe or pervasive to alter the terms or conditions of his employment with the AOWB.  (*See* Doc. # 58, at 31.)  Defendants' arguments are sound.

Concerning discrete acts, Joiner argues that Defendants subjected him to a racially hostile work environment based on the following:  (1) failure to promote; (2) denial of training opportunities; (3) disparate pay; (4) disparate treatment of black licensees; (5) his suspension; and (6) his termination.  (*See* Doc. # 66, at 49–50.)

The problem, as it relates to Joiner's hostile work environment claim, is that these "discrete discriminatory acts must be challenged as separate statutory violations and not lumped together under the rubric of hostile work environment." *McCann v. Mobile Cnty. Pers. Bd.*, No. 05-0364-WS-B, 2006 WL 1867486, at *20 (S.D. Ala. July 6, 2006), *aff'd*, *sub nom. McCann v. Tillman*, 526 F.3d 1370 (11th Cir. 2008). Here's why: Unlike "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire, a hostile work environment claim addresses acts different in kind whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule, and insult." *McCann*, 526 F.3d at 1378 (cleaned up). None of the discrete acts mentioned above involved intimidation, ridicule, and insult. Thus, they will not be considered in evaluating whether Defendants subjected Joiner to a hostile work environment. The court must determine whether Joiner's evidence, stripped of discrete acts evidence, presents a genuine dispute of material fact concerning his work environment. In short, it does not.

Joiner relies on a laundry list of events—primarily pertaining to Hines's management decisions—to support his hostile work environment claim. For example, he points to the fact that Hines denied him a key to the Montgomery office, relocated his office, failed to provide him a private office, installed a GPS tracking system on his AOWB vehicle, prevented him from accessing consumer complaint files on his computer, and instructed him not to speak with the Board Members.

(Doc. # 66, at 49–50.) Joiner also highlights that Board Members Mastin and Bradshaw attended his pre-dismissal conference wearing pistols (Doc. # 66, at 50),[9] and that he heard Todd refer to Ms. Owen as the "girl with the big old butt," (Joiner Dep., at 49). Joiner has not shown that these incidents are related to race; thus he fails to demonstrate that the harassment was based on a protected characteristic. *See Miller*, 277 F.3d at 1275 ("[T]he harassment must have been based on a protected characteristic of the employee . . ."); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 789, 803–04 (11th Cir. 2010) (considering only the alleged harassment that was based on the plaintiff's protected characteristic). Alternatively, even if Joiner had shown that they were related to race, these incidents do not demonstrate that the AOWB's workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [Joiner's] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation marks and citations omitted) (alterations added).

---

[9] Importantly, Joiner does not present any evidence that Mastin or Bradshaw brandished, unholstered, or otherwise physically threatened him with the firearms during the pre-dismissal conference. Nor does Joiner present evidence indicating that Mastin's and Bradshaw's wearing of pistols was racially motivated. *See Head v. Pitts Enters, Inc.*, No. 1:09cv187-WHA, 2010 WL 2773376, at *9 (M.D. Ala. July 14, 2010) (declining to consider evidence that supervisors brought firearms to work when evaluating the plaintiffs' hostile work environment claim because the plaintiffs failed present evidence that the bringing of firearms to work was connected to race).

Joiner does identify *two* instances—during his nearly thirteen-year career with the AOWB—involving conduct or comments connected to his race. First, Hines asked Joiner if it was true "once you go black, will you ever go back?" (Joiner Dep., at 41.) Second, Hines laughed after Joiner informed her about a racist comment that a licensee made to him. (Joiner Dep., at 40.) The question becomes whether this harassment was sufficiently severe or pervasive to create a hostile working environment.

The Eleventh Circuit has explained that "this element contains both subjective and objective components; that is, to be actionable, the harassment must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Bryant*, 575 F.3d at 1297 (cleaned up). Because Defendants do not dispute that Joiner subjectively believed he was suffering abuse due to his race, the subsequent analysis focuses on the objective component.

Courts consider four factors when assessing the objective severity of a purported hostile work environment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276.

The two incidents involving Joiner's race fall far short of the frequency required to maintain a claim for hostile work environment. *Compare Mendoza*, 195 F.3d at 1249 (holding that the sexual harassment at issue, which occurred over an eleven-month period, was infrequent when it involved a "single instance of slight physical contact, one arguably inappropriate statement, and three instances of" other inappropriate behavior), *with Miller*, 277 F.3d at 1276 (holding that the harassment at issue was frequent when the plaintiff was subjected to "ethnic slurs . . . three to four times a day" during a one-month period), *and Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that the harassment at issue "was not infrequent" when the plaintiff pointed to "roughly fifteen separate instances of harassment over the course of four months").

Nor were the two incidents severe. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1256–57 (11th Cir. 2014) (holding a plaintiff did not experience severe harassment when, among other things, his supervisor told him a racist joke; he heard a coworker use a racial epithet; and "a coworker once called him 'boy'"). Rather, these incidents are akin to the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" and, as a result, do "not sufficiently affect the conditions of employment to implicate [a hostile work environment]." *Harris*, 510 U.S. at 21 (quotation marks and citation omitted) (alteration added). Moreover, Hines's conduct toward Joiner was not physically threatening, nor has Joiner

presented evidence that Hines's conduct unreasonably interfered with his job performance.

Thus, under the totality of the circumstances, a reasonable jury could not find Joiner's work environment objectively hostile. Accordingly, Defendants are entitled to summary judgment on Joiner's hostile work environment claim.

## C. <u>Equal Protection (Disparate Treatment)</u>

Before delving into the merits of Joiner's disparate treatment claim (or rather claims), some parsing is required. Joiner alleges in his second amended complaint *one claim* of disparate treatment on the basis of his race for failure to promote, denial of training opportunities, disparate pay, his suspension, and his termination. (*See* Doc. # 44, at 23–27.)[10] Likewise, his summary judgment briefing treats these distinct acts as *one claim* for disparate treatment. (*See* Doc. # 66, at 65–73.) This approach is confusing and problematic because the discrete acts described above are *separate claims*, each requiring individualized (albeit similar) analysis. While Joiner failed to delineate his disparate treatment claims, the court does not have the same

---

[10] To the extent that Joiner attempts to bring "a pattern-or-practice" claim (*see* Doc. # 44, at 26 (alleging that "Defendants have engaged in a pattern and practice of racial discrimination against African-Americans"), that claim fails. *See Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 965, 968 n.29 (11th Cir. 2008) (explaining that a pattern-or-practice claim may be brought only by a private individual as a class action under Rule 23 of the Federal Rules of Civil Procedure), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

luxury. Thus, each of Joiner's disparate treatment claims will receive the individualized analysis due them.

"The Equal Protection Clause of the Fourteenth Amendment prohibits race . . . discrimination in public employment." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018).[11] A plaintiff may rely on either direct or circumstantial evidence to prove that a defendant acted with discriminatory intent. *Id*. When a plaintiff relies on circumstantial evidence, as Joiner does here, "the claim is evaluated under the burden-shifting framework established in *McDonnell Douglas Corp. v. Gree*n, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id*. Circumstantial evidence "suggests, but does not prove, a discriminatory motive . . . ." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 922 (11th Cir. 2018) (citation and internal quotation marks omitted).

Under the familiar *McDonnell-Douglas* paradigm, the plaintiff must first make out a prima facie case of discrimination. If the plaintiff succeeds, "[t]he burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action." *Hornsby-Culpepper*, 906 F.3d at 1312. If the defendant proffers a non-discriminatory reason, the "plaintiff must the prove . . . that the

---

[11] Like his hostile work environment claim, Joiner's equal protection disparate treatment claim is "cognizable under § 1983, and [is] subject to the same standards of proof and use[s] the same analytical framework as discrimination claims brought under Title VII . . . and . . . § 1981." *Hornsby-Culpepper*, 906 F.3d at 1312 n.6 (alterations added).

legitimate reason proffered was a mere pretext for discrimination." *Id*. "It is at this stage that the plaintiff's 'burden . . . merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "[I]f a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." *Id*.

"Provided that the proffered reason is one that might motivate a reasonable employer, [the plaintiff] must meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). The employee does not rebut the reason "by simply quarreling with the wisdom of that reason," *id*., but by exposing "weaknesses, implausibilities, inconsistencies, incoherencies[,] or contradictions" in the employer's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1279 (11th Cir. 2008) (explaining that to show pretext, the plaintiff must "demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated

was insufficient to warrant the adverse action"). "A reason is not pretext for discrimination," however, "'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

*1. Joiner fails to establish that his termination was a pretext for race discrimination.*

### a. Prima facie case

Beginning with the first *McDonnell-Douglas* step, Joiner satisfies his prima facie case regarding his termination. A plaintiff can establish a prima facie case on a disparate treatment termination claim by showing "(1) that [he] was a member of a protected class, (2) that [he] was qualified for the job, (3) that [he] suffered an adverse employment action, and (4) that [he] was replaced by someone outside the protected class." *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000) (alterations added). Here, no one disputes that Joiner—an African American—is a member of a protected class; that he was qualified for the position of field compliance officer; and that he suffered an adverse employment action when Hines terminated his employment with the AOWB. Also not subject to debate is the fact that Hines replaced Joiner with an individual outside the protected class: Caleb Kilpatrick (a white man). (Hines Dep., at 15, 18); *see also Cuddeback v. Fla. Bd. of*

*Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004) (noting that the district court erred in finding that the plaintiff failed to establish her prima facie case of gender discrimination when the evidence established that a male took over her position).  In fact, Defendants apparently concede that Joiner has made out his prima facie case. (*See* Doc. # 71, at 29 n.26 ("With respect to Joiner's claim that his dismissal . . . constituted [an] adverse action[], Defendants assume for the sake of argument that he established a prima facie case of discrimination when he provided evidence Hines hired a white person to fill Joiner's position.").)  Accordingly, the analysis proceeds to the next step of the *McDonnell-Douglas* framework.

### b.  Legitimate, non-discriminatory reasons

Defendants persuasively assert that Hines possessed legitimate, non-discriminatory reasons for suspending Joiner and terminating his employment. "An employer's burden to articulate a non-discriminatory reason" for the adverse employment action "is a burden of production, not of persuasion." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769–70 (11th Cir. 2005) (citation omitted). Thus, the employer "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Because the employer's "burden involves no credibility determination, it has been characterized as exceedingly light." *Vessels*, 408 F.3d at 769–70. The employer need only "clearly set forth, through the introduction of admissible evidence, the

reasons for the plaintiff's [termination]." *Burdine*, 450 U.S. at 254; *see also id.* at 258 (explaining that "[l]imiting the defendant's evidentiary obligation to a burden of production will [not] unduly hinder the plaintiff" because "the defendant's explanation of its legitimate reasons must be clear and reasonably specific"). "Placing this burden of production on the defendant . . . serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255–56.

To support their position that Hines suspended and terminated Joiner for legitimate, non-discriminatory reasons, Defendants point to the notice of suspension letter (Doc. # 57-23) and dismissal letter (Doc. # 57-30), both of which detail the reasons for Hines's respective decisions. For instance, the suspension letter outlined (with specificity) Joiner's unprofessional conduct during two separate AOWB meetings, informed him of his failure to comply with Policy 2018, and cited the specific SPB rules that Joiner's conduct violated. Similarly, the dismissal letter listed five separate infractions (complete with the dates and a description of the violative behavior) warranting Joiner's dismissal and cited the specific SPB rules that his conduct violated.

Based on the foregoing, Defendants have provided specific and detailed evidence demonstrating how Hines reached her decision to suspend and eventually

terminate Joiner's employment. Hines's reasons, which rely on work-rule violations, are legitimate, non-discriminatory reasons for suspending and dismissing Joiner. Because Defendants have "framed the factual issue with sufficient clarity," Joiner "will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56. The analysis thus turns to pretext.

### c. Pretext

Joiner's termination claim fails because he has not rebutted Defendants' proffered legitimate, non-discriminatory reasons for his dismissal. His only argument concerning pretext on this claim is that he did not engage in the misconduct that ultimately led to his firing. (*See* Doc. # 66, at 70.) This lone argument is deficient for several reasons. First, Joiner is estopped from relitigating the factual circumstances surrounding his termination. *See supra* at 26–27. The ALJ presiding over Joiner's termination appeal found that the factual circumstances supporting Joiner's dismissal did not constitute a "'he said, she said' situation." (Doc. # 57-47, at 16.) Instead, "[n]umerous witnesses, including co-workers, AOWB members, two employees of another state agency and one AOWB licensee testified that Joiner was openly disrespectful, disruptive, insubordinate, and unprofessional" prior to his termination. (Doc. # 57-47, at 16.)

Second, "[w]here an employee argues that he did not actually engage in misconduct," as here, "an employer may rebut this allegation by showing its good

faith, honest belief that the employee violated a rule." *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1136 (11th Cir. 2012). Focusing on the facts underlying an employer's asserted belief helps ensure that the court does not become a "super-personnel department" because "it is not [the court's] role to second guess the wisdom of an employer's business decision—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)); *see also Dawson v. Henry Cnty. Police Dep't*, 238 F. App'x 545, 549 (11th Cir. 2007) ("The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue.").

Joiner's assertion that he did not violate the rules, policies, and procedures of the AOWB and SPB does not prove pretext, nor has he presented evidence to impugn the truthfulness of Defendants' position that he did in fact violate those rules, policies, and procedures. Thus, Defendants are entitled to summary judgment on Joiner's disparate treatment claim alleging a racially discriminatory termination.[12]

---

[12] Because summary judgment is due to be granted on Joiner's disparate treatment termination claim, the court need not address Defendants' "same-decision" argument.

*2. Joiner cannot establish a prima facie case on his suspension claim because he has not identified a similarly situated comparator.*

Joiner's suspension claim fails at the threshold because he has not put forth a comparator who is "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc). In *Lewis*, the Eleventh Circuit explained that whether the plaintiff and the proposed comparator are similarly situated in "all material respects" requires a case-by-case analysis: "Ordinarily, for instance, a similarly situated comparator . . . (1) will have engaged in the same basic conduct (or misconduct) as the plaintiff," (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff," (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and (4) "will share the plaintiff's employment or disciplinary history." *Id*. at 1227–28 (citations omitted).

Here, Joiner identifies Todd as his comparator. In April 2017, Hines issued Todd a written reprimand following his unprofessional conduct during an AOWB board meeting. (*See* Doc. # 57-35 (Letter of Reprimand).)[13] In May 2019, Hines suspended Joiner for fourteen days without pay based on his unprofessional conduct

---

[13] It bears mentioning that Hines fired Todd roughly nine months later for continued insubordination. (*See* Doc. # 57-36 (Todd's notice of dismissal letter).)

during two separate AOWB meetings and his failure to schedule compliance visits and turn in activity sheets. (*See* Docs. # 57-23, 57-24.) Joiner complains that he was suspended for his infractions, while Todd was not. His argument fails to acknowledge that the written reprimand was Todd's *first* formal discipline as an AOWB employee. (Hines Dec., at 7.) Conversely, Joiner's 2019 suspension came after he had already received a warning for failing to follow AOWB policies (Doc. # 57-21) and written reprimand for unprofessional conduct (Doc. # 57-19). In other words, Joiner is not similarly situated to Todd because they do not share the same disciplinary history. *Lewis*, 918 F.3d at 1228. Thus, Defendants are entitled to summary judgment on Joiner's suspension disparate treatment claim.

### 3. Joiner cannot establish a prima facie case of failure-to-promote.

To establish his prima facie case of failure-to-promote, Joiner must show, among other things, that he "applied for and was qualified for a promotion," that he "was rejected despite [his] qualifications," and that "other equally or less-qualified employees outside [his] class were promoted." *Brown v. Ala. Dep't of Trans.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (alterations added). Joiner has shown none of these things. First, Joiner presents zero evidence that he ever applied for the chief compliance officer position and, as a result, was ever rejected. At most, he adduces evidence that Talley (the outgoing AOWB executive director) *suggested* to Hines and the Board Members that they promote Joiner to chief compliance officer.

(Talley Dep., at 10–12.)[14] Talley's suggesting that Hines and the Board Members promote Joiner to chief compliance officer does not equate to Joiner's applying for the position. Second, even if this suggestion amounted to an application on Joiner's behalf, the undisputed evidence shows that "[t]here are no individuals working for the AOWB as Senior Compliance Officer," and that Hines has "never hired any person into this position." (Hines Dec., at 5); *see also Ingram v. Kellogg Sales Co., Inc.*, CV 109-021, 2011 WL 13285055, at *5 (S.D. Ga. Feb. 23, 2011) (finding that the plaintiff could not establish her prima facie case of failure-to-promote when the position at issue was never filled by a person outside of her protected class). Because Joiner has failed to establish his prima facie case, Defendants are entitled to summary judgment on his failure-to-promote claim.

*4. Denial of training opportunities does not constitute an adverse employment action.*

Regarding training opportunities, Joiner asserts that Hines denied him the chance to attend *advanced* level training yet permitted white compliance officers to attend *basic* level training. Joiner's claim unravels at the prima facie stage because

---

[14] Even Talley was unsure if Hines and the Board Members could promote Joiner to chief compliance officer because after Talley departed, Joiner would have been the only compliance officer left at the agency, and he "didn't know if [they] could make [Joiner a] supervisor without somebody to supervise." (Talley Dep., at 11.)

he has not presented any evidence indicating that the denial of advance level training opportunities constitutes an adverse employment action.

To qualify as adverse, an employment action must be a "serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). And "[a]n adverse employment action based on denial of training is actionable only if the plaintiff can establish that the employer denied material opportunities to him." *Johnson v. Gestamp Ala., LLC*, 946 F. Supp. 2d, 1180, 1202 (N.D. Ala. 2013) (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 n.16 (11th Cir. 1998)).

Here, Joiner has not shown that the denial of advanced level training resulted in a serious or material change in his employment. Specifically, he does not present evidence indicating that the denial resulted in his being passed over for a promotion, reduced his salary, or caused him any other tangible harm. *See McGuire v. Miami-Dade Cnty.*, 418 F. Supp. 2d 1354, 1360 (S.D. Fla. 2006) (finding that the denial of a training opportunity did constitute an adverse employment action because the denial did not cause any tangible harm); *Madiedo v. Miami-Dade Cnty.*, No. 99-

1422-CIV, 2000 WL 1763845, at *4 (S.D. Fla. June 1, 2000) ("Generally, denial of a training that does not cause the denial of a promotion, bonus, or other benefit does not constitute an adverse employment action."). Absent such evidence, Hines's declining to send Joiner to advanced level training does not qualify as an adverse employment action. Moreover, the undisputed evidence shows that Hines did not send any field compliance officer to advanced level training, (Hines Decl., at 9; *see also* Joiner Dep., at 46 (testifying that to his knowledge, the AOWB has not sent any other employee to advanced level training)), and that Joiner had already attended basic level training classes (Joiner Dep., at 45). These facts further undercut Joiner's argument. Therefore, Defendants are entitled to summary judgment on Joiner's denial of training opportunities claim.

### 5. *Joiner's disparate pay claim survives summary judgment.*

Joiner makes two arguments concerning his disparate pay claim. First, he contends that Todd's salary was higher than his. He takes issue with this fact because Todd did not have prior experience in the field of wastewater compliance while Joiner possessed more than a decade of experience in the industry. (*See* Doc.

# 66, at 21.)[15]   Second, Joiner asserts that Barnes received comp time while he did

not.  (Joiner Decl., at 15.)[16]   Both arguments survive summary judgment.

### a.  Prima facie case

To make out his prima facie case of disparate pay, Joiner is required to show

that he occupied "a position similar to that of a higher paid employee who is not a

member of [his] protected class." *Crawford v. Carroll*, 529 F.3d 961, 974–75 (11th

Cir. 2008) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.

1994)).   "The comparators must perform jobs similar to the plaintiff's; thus, the

plaintiff must show that, in [his] job, [he] shared the same type of tasks as the

comparators." *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004) (cleaned

up), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457

---

[15]  While it appears that Joiner relies on his starting salary with the AOWB to support his disparate pay claim (*See* Doc. # 66, at 17), it is wholly irrelevant.  Indeed, it would be impossible for a reasonable jury to conclude that Joiner's lower starting salary was a product of Hines's (the decision maker) discriminatory animus—Joiner joined the AOWB in 2006; Hines did not become executive director until November 2016.  Consequently, she played no role in determining Joiner's initial salary with the AOWB.  Additionally, Joiner's reliance on Grah as a comparator for his disparate pay claim is misplaced.  During the relevant period, the record evidence indicates that Joiner made more money than Grah.  (*Compare* Doc. # 57-39 (showing that Grah made $1,637.10 (semi-monthly)), *with* Doc. # 67-20, at 3 (showing that Joiner made $1,690.91 (semi-monthly)).)

[16]  As a preliminary matter, the court finds that Joiner's not receiving *any* comp time while Hines was executive director amounts to an adverse employment action because it impacted his employee benefits "in a real demonstrable way." *Davis*, 245 F.3d at 1240; *see also Hall v. Dekalb Cty. Gov't*, 503 F. App'x 781, 788 (11th Cir. 2013) ("Because overtime and comp time opportunities affected compensation, a denial of such opportunities could constitute an adverse action.").

46

(2006) (per curiam). Again, the comparator must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218.

Here, Joiner identifies Todd and Barnes as comparators for his disparate pay claim. It is undisputed that Todd's starting pay in 2017—$1,942.30 (semi-monthly)—was higher than Joiner's at the time. (*See* Doc. # 57-34 (reflecting Todd's starting salary).) In fact, Joiner's pay never reached that of Todd's. (*See* Doc. # 67-20, at 3 (showing that Joiner's pay was $1,690.91 (semi-monthly) in 2019).) As for Barnes, Hines allowed him to receive comp time (*see* Hines Dep., at 64 (testifying that she allowed Barnes to receive comp time)), yet Joiner testifies that he did not receive the same benefit (Joiner Dep., at 43). Additionally, Joiner, Todd, and Barnes all worked as field compliance officers, thus sharing the same job responsibilities. Accordingly, Joiner has established a prima facie case for his disparate pay claim.

### b. Legitimate, non-discriminatory reasons

It is also undisputed that Hines requested that Todd start at a higher pay step to reflect the higher wages he earned with his previous employer. As justification for her request, Hines submitted Todd's pay stubs from his previous employer to the State Personnel Department. (*See* Doc. # 57-31.) The State Personnel Department approved Hines's request. (*See* Doc. # 57-34.) Concerning Todd's experience (or lack thereof), Hines testifies that she and the Board Members "agreed that it was best

to look for individuals with investigatory and regulatory experience, rather than individuals with specific knowledge related to the AOWB . . . or sewage generally." (Hines Decl., at 6.)  Moreover, she testifies that "the AOWB was weary of hiring existing AOWB . . . members due to the relationships that members have built with each other and the difficulty in individuals regulating their peers and prior competitors."  (Hines Decl., at 6.)  And, according to Hines, Todd possessed prior investigative experience.  (Hines Dep., at 21.)

Regarding comp time, Hines testifies that "the AOWB's policy for comp time simply required employees to discuss it with [her] beforehand and they would be approved."  (Hines Decl., at 12.)  However, according to Hines, Joiner never requested comp time and, as a result, did not receive any.  (Hines Decl., at 12; *see also* Hines Dep., at 64 (testifying that Joiner did not take any comp time).)  Hines also points to the fact that Joiner reviewed and signed the AOWB's comp time policy.  (Doc. # 57-49, at 2.)[17]  These explanations constitute legitimate, non-discriminatory reasons for starting Todd at a higher pay step and for why Joiner did not receive comp time.  Thus, the burden shifts back to Joiner to establish a question of fact as to whether these reasons are pretext for race discrimination.

---

[17]  The record does not contain a copy of the AOWB's comp time policy.

### c. Pretext

Whether Hines's legitimate, non-discriminatory reasons for starting Todd at a higher pay step is pretextual is a close call. Joiner cannot create a genuine dispute of material fact "by simply quarreling with the wisdom" of Hines's decision to hire field compliance officers with less experience in the wastewater industry but more experience in other areas relevant to the position. *Chapman*, 229 F.3d at 1030. However, Joiner has in his favor thirteen years of experience, advanced training, and a history of positive performance reviews (*See* Doc. # 57-17, at 2–26 (performance appraisals)), to counter the asserted reasons for the substantial discrepancy between Todd's starting pay and Joiner's current pay. The court has discretion, which it will exercise here, to permit this claim to proceed to trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Neither do we suggest that the . . . trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").

As to Joiner's comp time claim, Hines offers a weak explanation as to why Joiner did not receive comp time—simply that he did not request it. Hines's lone explanation is further weakened by Joiner's testimony that he received comp time during Talley's tenure as executive director, that Hines denied his request to come into the office early, and that Hines never allowed him to have comp time. (Joiner Dep., at 28, 43; Joiner Decl., at 15; Talley Dep., at 13.) This evidence, coupled with

the fact that Hines permitted Barnes to have comp time, is sufficient to create a disputed issue of material fact as to whether Hines's reason for not allowing Joiner comp time was a pretext for race discrimination.[18]

Accordingly, Defendants are not entitled to summary judgment on Joiner's disparate pay claims pertaining to his salary with the AOWB and comp time.

### 6. *Joiner fails to produce a "convincing mosaic" of discrimination.*

To be sure, "the *McDonnell Douglas* framework is not, and was never intended to be the *sin qua non* for a plaintiff to survive summary judgment in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Joiner may also survive summary judgment if he presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id*. (quotations marks omitted).

---

[18] Defendants argue that to the extent that Joiner's comp time claim rests "on changes that were made in 2016," his claim is barred by the statute of limitations. (Doc. # 58, at 39 (citing *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008)).) True, Joiner's § 1983 disparate treatment claim is subject to a two-year limitations period. *See Powell v. Thomas*, 643 F.3d 1300, 1303 (11th Cir. 2011) (explaining that "[a]ll constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought," and that "[i]n Alabama . . . that limitations period is two years"). However, when that clock starts running is a question of federal law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). In general, "the statute of limitations begins to run from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (cleaned up). Here, the two-year clock on Joiner's comp time claim began running once he discovered that Hines allowed Barnes to have comp time. This discovery necessarily came after the date that Hines hired Barnes—August 13, 2019. (Doc. # 57-41.) Joiner filed this suit on May 28, 2019 (Doc. # 1), well within two years of that date. Thus, Defendants statute of limitations argument is without merit.

"A convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185.

Here, Joiner makes no real effort to construct his convincing mosaic. He merely states that the mosaic exists and then references his disparate treatment argument. (*See* Doc. # 66, at 73 ("As established in [the disparate treatment section] and throughout this brief, Joiner presents a convincing mosaic of circumstantial evidence that survives summary judgment.").) This empty gesture is problematic because "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Nevertheless, as demonstrated above, the court has considered Joiner's circumstantial evidence of disparate treatment, along with the arguments of counsel, and concludes that Joiner has failed to establish a convincing mosaic of discrimination.

   *7. Joiner's mixed-motive discrimination claim also fails.*

"Discrimination claims brought under . . . § 1983 are typically categorized as either mixed-motive or single motive claims." *Quigg v. Thomas Cnty. School Dist.*,

814 F.3d 1227, 1235 (11th Cir. 2016) (footnote omitted). "An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on [race], was a motivating factor for an adverse employment action, even though other factors also motivated the action." *Id*. (cleaned up).

The *McDonnell-Douglas* paradigm is not the appropriate framework to evaluate a mixed-motive claim at the summary judgment stage. *Id*. at 1238. Instead, "to avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the employer took an adverse employment against [him]; and (2) a protected characteristic was *a* motivating factor for the employer's adverse employment action." *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018) (cleaned up). Put differently, "the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [his] protected characteristic was a motivating factor for an adverse employment decision." *Quigg*, 814 F.3d at 1239 (cleaned up).

Joiner argues that his disparate treatment claims survive under a mixed-motive analysis. (Doc. # 66, at 71.) He relies on the Eleventh Circuit's *Quigg* decision to support his position. That case, however, undercuts rather than supports his argument.

In *Quigg*, the plaintiff argued that the defendants were "liable for sex discrimination under . . . § 1983 because the [defendants'] decision not to renew her contract was based on her sex and gender." 814 F.3d at 1240 (alteration added and footnote omitted). The Eleventh Circuit held that the plaintiff "presented sufficient evidence for a reasonable jury to conclude that her sex or gender was a motivating factor in the decision not to renew her contract" because "[v]arious statements made by [the defendants] . . . indicate[d] that sex or gender-based bias was a motivating factor in their votes against her." *Id*. at 1241 (alterations added). These statements included "it is time to put a man in there"; that the plaintiff needed to hire "a tough 'hatchet man'"; that the plaintiff "consider a male assistant superintendent because it was important to achieve gender balance in the school administration"; and that the plaintiff "'needed a strong male to work under her to handle problems, someone who could get tough.'" *Id*. The court emphasized that the defendants "made the statements (1) during conversations about whether to renew [the plaintiff's] contract, (2) in relative temporal proximity to the vote, and (3) specifically refer[ed] to the composition of the [plaintiff's office]." *Id*. at 1242 (alterations added). Thus, the court concluded that the statements indicated that the defendants "preferred men—or, at least, individuals with masculine characteristics—for positions within the [plaintiff's office]." *Id*. at 1241–1242 (alterations added).

Here, Joiner's circumstantial evidence of race discrimination falls far short of the circumstantial evidence in *Quigg*. Specifically, he does not identify any statements made by Defendants indicating that race was a motivating factor in any of the adverse employment actions he suffered. The statements Joiner does identify (*i.e.*, Hines's "once you go black" comment and Hines's laughing when he told her about a racist comment from a licensee) are not connected to the adverse employment actions he incurred. In other words, Joiner does not present evidence that race influenced his termination, his suspension, his lack of promotion, or his denial of training opportunities. Thus, his mixed-motive theory as to these aspects of his disparate treatment claims fails.

## D. **First Amendment Retaliation**

Joiner contends that he engaged in speech protected under the First Amendment when he informed Hines and the Board Members that he was experiencing racial discrimination. According to Joiner, Defendants retaliated against him for engaging in this speech when Hines suspended, and ultimately terminated, his employment with the AOWB. Moreover, Joiner asserts that when he "complained of racial discrimination, he spoke as a citizen, rather than as part of his official duties, and his protected activity involved matters of public concern." (Doc. # 66, at 75.) Defendants counter, arguing that Joiner's speech did not touch upon a matter of public concern because "Joiner only brought his complaints forward

to individuals in a private manner" and that his complaints focused on how the AOWB treated him as an individual. (Doc. # 58, at 59.) Defendants have the better argument.

A government employer, like the AOWB, "may not demote or discharge a public employee in retaliation for speech protected under the first amendment . . . ." *Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1168 (11th Cir. 2013) (citation and internal quotation marks omitted). However, "a public employee's right to freedom of speech is not absolute." *Id*. As the United States Supreme Court has explained, a public employee does not enjoy an unqualified right to freedom of speech because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968). Thus, the aim is to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. (alteration added).

Courts analyze four elements when evaluating a First Amendment retaliation claim: First, "whether the employee's speech involves a matter of concern"; second, "whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service"; third, "whether the speech played a substantial

part in the government's challenged employment decision"; and fourth, "whether the government would have made the same employment decision in the absence of the protected conduct." *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1563–64 (11th Cir 1995) (citation omitted). The first two elements are "questions of law that are decided by the court." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (citation omitted)

"To determine '[w]hether an employee's speech addresses a matter of public concern,'" courts "must examine 'the content, form, and context' of the speech, 'as revealed by the whole record.'" *Carter*, 731 F.3d at 1168 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)) (alteration in original). The "public concern" requirement serves "to prevent the federal courts from becoming 'a roundtable for employee complaints over internal office affairs.'" *Id.* (quoting *Connick*, 461 U.S. at 149). And the Eleventh Circuit has "emphasized that 'a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run.'" *Id.* (quoting *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986)). Here, Joiner fails to demonstrate that his personalized complaints about discrimination qualify as a matter of public concern. A decision from the Eleventh Circuit—*Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1993)—provides guidance.

In *Morgan*, the plaintiff, a Georgia department of corrections employee, argued that various defendants "abridged her First Amendment right to free speech after she complained to [the Superintendent of the Augusta Correctional Medical Institute], the Internal Affairs Division, and the Georgia Office of Fair Employment Practices that she was being [sexually] harassed in the workplace." *Id*. at 753 (alterations added and footnote omitted). Following her complaints, the plaintiff received poor performance reviews, and unfavorable job assignments, and ultimately resigned from her position. *Id*. at 752–53. The plaintiff asserted "that her speech—the complaints of sexual harassment—involve[d] a public concern, because sexual harassment in the workplace [was] a matter of vital social interest." *Id*. at 754 (alterations added). Although the court agreed with the plaintiff "that sexual harassment in the workplace [was] a matter of important social interest," it also noted that "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest [was] of little moment." *Id*. (cleaned up). Instead, the determinative issue was "whether the purpose of [the plaintiff's] speech was to raise issues of public concern, on the one hand, or to further her own private interest, on the other." *Id*. (citations omitted).

After examining the plaintiff's complaints, the *Morgan* court held that her "speech was not a matter of public concern." *Id*. at 755 (citations omitted). The court reasoned that the plaintiff's "speech largely focused upon how [her supervisor]

behaved toward her and how that conduct affected her work." *Id*. Additionally, the plaintiff's speech came "in the form of complaints to official bodies," and she "did not relate her concerns about sexual harassment to the public, or attempt to involve the public in any manner." *Id*. (footnote omitted). Because the plaintiff's "speech was driven by her own entirely rational self-interest in improving the conditions of her employment," the court concluded that her complaints amounted to an "employee grievance" and "was not a matter of public concern." *Id*.; *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1530 (11th Cir. 1997) (holding that the plaintiff's "*ante litem* notice alleging discrimination on the basis of his disability was not a matter of public concern" because the "notice solely complain[ed] of [the plaintiff's] personal grievance with respect to his alleged treatment by [the defendant] . . .); *Watkins v. Bowden*, 105 F.3d 1344, 1353 (11th Cir. 1997) (holding that the plaintiff's speech was not a matter of public concern because her complaints about gender and race discrimination were private, informal, and centered on how her co-workers personally treated her).

Like *Morgan*, Joiner's complaints to Hines and the Board Members focus almost exclusively on how Hines acted toward him and how that conduct personally affected his work. For example, Joiner complained to Hines and various Board Members about Hines's decision to install a tracking device on his AOWB vehicle; Hines's not promoting him to chief field compliance officer; Hines's moving him

out of his office; Hines's not giving him a key to the AOWB's Montgomery office; Hines's removing consumer complaint files from his computer; and Hines's policy requiring him to call into the AOWB office three times per day. (*See* Joiner Dec., at 7–9.)[19] And, akin to *Morgan*, the record does not contain any evidence suggesting that Joiner attempted to make his private complaints about racial discrimination public. Because Joiner's complaints center on personal grievances that he had with Hines, and because he did make any attempt to convey these grievances to the public, his speech does not constitute a matter of public concern. Accordingly, Defendants are entitled to summary judgment on Joiner's First Amendment retaliation claim.

### E. Joiner's § 1983 Claims Against the Individual Board Members

Defendants argue that all claims against the individual Board Members should be dismissed because "[t]here is no evidence from which a reasonable jury could find that any of the Board Defendants personally caused the alleged violations of Joiner's constitutional rights . . . ." (Doc. # 58, at 29.) Put differently, the Board Members contend that Joiner's claims against them are predicated on the theory of *respondeat superior*, which is insufficient to establish liability under § 1983. For his part, Joiner asserts that certain Board Members personally participated in the

---

[19] To the extent that Joiner argues that his complaint to Hines about the AOWB's treatment of black licensees qualifies as a matter of public concern, that argument fails. *See Morgan*, 6 F.3d at 755 (explaining that even though the plaintiff "did speak about her co-worker's [experience of sexual harassment], which contain[ed] a public concern aspect . . ., the main thrust of her speech took the form of a private employee grievance") (citation omitted and alterations added).

alleged constitutional violations and that a causal connection exists between the actions (or inactions) of the Board Members and the alleged constitutional violations.

It is well settled that "*respondeat superior* does not apply in § 1983 actions." *Averhart v. Warden*, 590 F. App'x 873, 874 (11th Cir. 2014); *see also Hardin v. Hayes*, 957 F.2d 845, 849 (11th Cir. 1992) ("Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability.") However, § 1983 liability can extend to supervisors under limited circumstances: "Supervisory liability under § 1983 occurs when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006) (citation and internal quotation marks omitted); *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

A plaintiff can establish the causal connection necessary to impose supervisory liability under § 1983 in three ways: (1) demonstrating "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) showing that a "supervisor's policy or custom results in deliberate indifference to constitutional rights"; or (3) adducing evidence that supports "an inference that the supervisor

directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (cleaned up), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).  Moreover, constitutional deprivations "that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 820 (11th Cir. 2017) (citation and quotation marks omitted).  The Eleventh Circuit has described the standard for establishing supervisory liability under § 1983 as "extremely rigorous." *Piazza v. Jefferson Cnty., Ala.*, 923 F.3d 947, 957 (11th Cir. 2019) (citation omitted).

Here, Joiner's supervisory liability claim as to Count 1 (hostile work environment), Count 3 (First Amendment retaliation), and nearly all of Count 2 (disparate treatment) can be easily resolved.  As previously discussed, Joiner has failed to show a deprivation of his constitutional rights based on a racially hostile work environment, First Amendment retaliation, his termination, his suspension, failure-to-promote, and denial of training opportunities.  Therefore, he cannot maintain a § 1983 action for supervisory liability against the Board Members based on these claims.  *See Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005) (holding

that the plaintiff could not maintain a supervisory liability claim against the defendant supervisors absent an underlying constitutional violation).

Joiner's supervisory liability claim against the Board Members regarding disparate pay fares no better. Joiner has not presented any evidence showing that the Board Members personally participated in Hines's decision to start Todd at a higher pay step and to deny him comp time or that there was a causal connection between such decisions and the Board Members' actions or inactions. Accordingly, Defendants are entitled to summary judgment on Joiner's supervisory liability claim.

## F. Punitive Damages and Injunctive Relief

Joiner seeks punitive damages and injunctive relief under § 1983 in connection with his disparate pay claims against Hines. (Doc. # 44, at 27.) Hines argues that summary judgment is warranted on both issues. (Doc. # 58, 64–65.)

Beginning with punitive damages, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Upon consideration of the evidence presented by Joiner in relation to his disparate pay claim, the court concludes that resolution of the punitive damages issue is a matter better suited for trial. Thus, Hines is not entitled summary judgment on this issue and Joiner's request for punitive damages is carried to trial.

Turning to injunctive relief, Joiner has sued Hines in her individual capacity. (*See* Doc. # 44, at 1.) "However, state officers may only be sued in their individual capacity for money damages under [§ 1983]." *Jones v. Buckner*, 963 F. Supp. 2d 1267, 1281 (N.D. Ala. 2013) (collecting cases) (alteration added). Thus, Hines is entitled to summary judgment on Joiner's § 1983 claim for injunctive relief.

## V. CONCLUSION

Joiner has presented sufficient evidence, drawn in the light most favorable to him, to permit a reasonable jury to conclude that Hines's proffered reasons for paying Joiner less than Todd and denying Joiner comp time are pretext for race discrimination in violation of the Equal Protection Clause. Consequently, summary judgment for Hines on these claims is not appropriate. All other claims fail.

Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 56) is GRANTED in part and DENIED in part as follows:

(1)    GRANTED as to Count 1 (hostile work environment);

(2)    DENIED as to Joiner's disparate pay claims alleging intentional discrimination under the Equal Protection Clause;

(3)    GRANTED as to all other aspects of Count 2 (disparate treatment);

(4)    GRANTED as to Count 3 (First Amendment retaliation);

(5)    GRANTED as to Joiner's supervisory liability claim;

(6)     DENIED without prejudice as to Joiner's request for punitive damages in connection with his disparate pay claims;

(7)     GRANTED as to Joiner's request for injunctive relief against Hines in her individual capacity.

It is further ORDERED that the Clerk of the Court is DIRECTED to terminate Randall Anderson, Brent Bradshaw, Michael T. Dansby, Sharon Kimbrough, David Mastin, Michelle Stephens, David Vogelgesang, Kevin White, and Leigh Willis as Defendants.

DONE this 12th day of July, 2021.

_____
/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE